**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

**CIVIL ACTION NO. 04-158-JBC**

**J.K., by his next friend,**
**H.M., his mother,**                                                              **PLAINTIFF,**

**V.**                              **MEMORANDUM OPINION AND ORDER**

**FAYETTE COUNTY BOARD OF EDUCATION,**                          **DEFENDANT.**

**\* \* \* \* \* \* \* \* \* \***

This matter is before the court on the plaintiff's motion to dismiss the

decision of the Exceptional Children and Appeals Board (DE 13), essentially a

motion for judgment on the pleadings.  The court, having reviewed the record and

being otherwise sufficiently advised, will deny the plaintiff's motion and enter

judgment for the defendant.

**I.      Factual and Procedural Background**

The plaintiff, J.K., was diagnosed with Attention Deficit Hyperactive Disorder

when he was four years old.  J.K. exhibits explosive behavior, is verbally and

physically aggressive, does not comply with authorities, and displays oppositional

defiance.  Based on his diagnosis, J.K. qualifies for special education services under

the Individuals with Disabilities Education Act (IDEA).  The defendant is the local

educational agency (LEA) charged with providing those services to J.K.

In 2003, J.K. completed the fifth grade in the Fayette County public schools

system at James Lane Allen Elementary.  Near the end of the 2002-2003 school

year, on April 28, 2003, the LEA held a meeting of the admissions and release

committee (ARC) to facilitate J.K.'s transition to Beaumont Middle School.  In the course of that meeting, the ARC revised J.K.'s individual educational program (IEP). The IEP stated J.K.'s educational goal as demonstrating self-control and self-discipline.  The April 28, 2003, IEP essentially reiterated the short-term objectives stated in the previous IEP, dated November 25, 2002: (1) using appropriate language in interactions with authority figures and peers; (2) using appropriate physical control in interactions with authority figures and peers; and (3) following instructions and completing assignments.  The recommended individual modifications for classroom instruction were also substantially the same.  The April 28, 2003, IEP also provided that the staff and faculty at Beaumont Middle School would receive training on the book *Explosive Child* by Ross Greene.  The IEP also referred to a Behavior Intervention Plan (BIP).

On September 12, 2003, shortly after J.K. began middle school, the ARC met to evaluate and revise J.K.'s IEP in light of his adjustment to the new environment.  School authorities and J.K.'s mother were concerned for his safety because he frequently wandered in the halls and outside the building.  The school was also bothered by the frequency with which J.K. was missing classes.  The ARC made modifications to the BIP according to *Explosive Child*, dividing problematic behaviors into three categories with specific mechanisms prescribed for dealing with each category.  In addition, the ARC supplemented J.K.'s IEP by adding 13 academic goals.  Finally, the ARC assigned J.K. to the resource room for specialized attention in the mornings because his teachers observed that he was

more successful in smaller, more structured settings.  The increased restriction was intended to provide more behavior intervention and support and to improve J.K.'s time in class by limiting his transitions.  The ARC noted that his IEP could not be implemented in the regular education setting.

Another ARC meeting was convened on October 13, 2003.  At that time, little or no progress had been made toward the objectives stated in J.K.'s IEP; he still attended class infrequently and was apparently participating less than before.  Although J.K. was staying in the school building, he frequently slept in the office or nurse's station.  At this meeting, the ARC discussed the possibility of increasing the time J.K. spent in the resource room, because he tended to be more productive there.  No decision was made about his placement at that time.

The ARC met again on October 16, 2003.  Prior to this meeting, J.K. had been arrested at school on September 13, 2003, and on October 14, 2003.  J.K. was charged with disorderly conduct in September after biting and scratching a teacher.  He qualified for diversion, through which he attended educational seminars and performed community service.  In October, J.K's aide required medical attention after J.K. shoved him.  J.K. was arrested, taken to a juvenile facility, and charged with felony assault.  Again, J.K. entered the diversion program.

At the October 16, 2003, meeting, J.K.'s sporadic attendance remained a concern.  The ARC members agreed that more restrictive placement was necessary and that the current programming was not appropriate for implementing his IEP,

3

particularly given his recent arrests.  Therefore, the ARC decided to place J.K. in the resource room except for social studies and physical education.[1]

J.K.'s mother brought up the possibility of sending J.K. to Kamp Kessa for one week.  Kamp Kessa is a therapeutic wilderness camp; the camp receives referrals from juvenile courts and public schools systems.  Ken Howard, the chairperson of the ARC, called the School Board to ask about the feasibility of placing J.K. at the camp and reported that funds could not be approved without a consensus being reached as to its appropriateness.  At that time, there was very little information available to the ARC about the camp, and ARC members had doubts about safety, considering J.K.'s emotional instability and its propriety for implementing J.K.'s IEP.  Furthermore, the ARC felt that the full continuum of services at the school had not been exhausted and that outside placement was therefore not proper at that time.  The ARC determined to meet again on October 31, 2003.

J.K.'s mother decided to send him to Kamp Kessa despite the lack of assurance that she would be reimbursed for the enrollment fee of $650.  During his week at camp, which was during school, J.K. performed outdoor chores, learned to handle horses, and interacted with fellow campers.  According to his mother and the camp director, J.K. was happier at the end of the week and had made significant progress in his social interactions.

---

[1]J.K. attended school only one day with the new resource room placement.

On October 20, 2003, J.K.'s mother requested a due process hearing. Thereafter, the LEA rescheduled the October 31 meeting for November 10, 2003, so that an employee from the central office could be present.

On November 10, 2003, the ARC held its annual review of J.K.'s situation. The ARC made substantial revisions to the IEP, such as elaborating on his then-current performance levels[2] and re-stating his short-term objectives.  The ARC was informed of J.K.'s recent bipolar disorder diagnosis.

The ARC met again on November 12, 2003, to continue the November 10th meeting and discuss J.K.'s placement.  At that time, they decided to request staff training in life/space crisis intervention from the school board.  The ARC also resolved that multiple adults should be present in the classroom to help J.K.  The ARC assigned J.K. to the resource room all day, during physical activities and breaks as well as class time, and planned to physically reorient the classroom to provide an area for J.K. to use for de-escalation when he became anxious or stressed.

A due process hearing was held by a local hearing officer (LHO) on December 2 and 3, 2003, to address J.K.'s request for reimbursement for the cost of Kamp Kessa.  The issues directed to the LHO were (1) whether the LEA failed to implement J.K.'s IEP; (2) whether the LEA assigned J.K. to the least restrictive placement; (3) whether procedural requirements were met; and (4) whether the

---

[2]The IEP was modified to reflect the ARC's concerns with J.K.'s sleeping during school, class attendance, lack of focus, and poor interpersonal skills.

LEA's refusal to reimburse J.K. for Kamp Kessa constituted a denial of a free and appropriate public education (FAPE) as guaranteed under IDEA.

The LHO concluded that the ARC violated IDEA procedure by failing to properly modify J.K.'s IEP.  The LHO further found that the procedural violation denied J.K. a FAPE because the IEP did not address J.K.'s attendance problem and was not adequately implemented.  The LHO determined that J.K.'s placement at Kamp Kessa was appropriate and that J.K. was therefore entitled to reimbursement.

The LEA appealed the LHO's decision to the Exceptional Children and Appeals Board (ECAB).  The ECAB reversed the LHO's holding that the failure to modify the IEP was a violation of IDEA, because the ARC members, including J.K.'s mother, at all times agreed that the IEP was appropriate.  Because J.K.'s mother did not give the LEA a sufficient opportunity to implement the IEP, there was no indication that the LEA was incapable of providing J.K. a FAPE.  Furthermore, even if the LEA had not been able to provide a FAPE, given the limited information on and duration of the Kamp Kessa program, the LHO erred in concluding that unilateral placement at Kamp Kessa was appropriate in the context of the IEP.  Therefore, the ECAB ruled that the defendant could not be required to compensate J.K. for the cost of attending Kamp Kessa.

## II.    Standard of Review

A district court reviews the administrative decision in IDEA cases under a modified *de novo* standard.  Courts require strict compliance with the procedural

provisions of IDEA.  *Burilovich v. Bd. of Educ.*, 208 F.3d 560, 566 (6th Cir. 2000).

Where educational expertise is relevant to the substantive findings and the decision

below is reasonable, the court should defer to the administrative agency.  *Id.* at

567.  If the holdings of local and state hearing officers conflict, then deference is

given to the state hearing officer.  *Id.*  If the matter arises on a motion for summary

judgment, the court must also ensure that there are no genuine disputes concerning

material facts.  *Id.*

### III.    Legal Analysis

IDEA is not intended to create either equal opportunity or equal services for

handicapped children, nor is its purpose to maximize each child's potential.  *Bd. of

Educ. v. Rowley*, 458 U.S. 176, 198 (1982).  Rather, the basic floor of opportunity

guaranteed by IDEA is limited to "access to specialized instruction and related

services which are individually designed to provide educational benefit to the

handicapped child."  *Id.* at 200.  A child is provided a FAPE if he is given

"personalized instruction with sufficient support services to permit [him] to benefit

educationally from that instruction."  *Id.* at 203.  Services must be publicly funded,

consistent with state educational standards and regular education programs, and

must conform to the child's IEP.  *Id.*

When a child's access to a FAPE is challenged, the court must determine

whether IDEA procedures were followed and whether the IEP was "reasonably

calculated to enable the child to receive educational benefits."  *Id.* at 206.  If

procedural violations were committed, then the plaintiff is entitled to relief only if

the violations caused substantive harm.  *Knable* ex rel *Knable v. Bexley City Sch.*

*Dist.*, 238 F.3d 755, 765 (6th Cir. 2001).  Substantive harm is present where a

student is deprived of a FAPE or an educational opportunity.  *Id.* at 766.

Where an IEP is challenged, the burden of proof is on the plaintiff to show

that it is inappropriate.  *Doe v. Bd. of Educ. of Tullahoma City Sch.*, 9 F.3d 455,

458 (6th Cir. 1993).  IDEA does not mandate that the state provide the best

possible educational environment for each child.  *Id.* at 459.  Furthermore, an IEP

must be given a chance to succeed before it can be deemed inappropriate.  *Id.*

If the court determines that procedural or substantive defects denied a

student a FAPE, then the plaintiff is entitled to reimbursement for unilateral private

placement as long as the private placement was proper under IDEA.  *Florence*

*County Sch. Dist. Four v. Carter*, 510 U.S. 7, 12-13 (1993); *Knable*, 238 F.3d at

770-71.  The private placement need not meet the definition of a FAPE under IDEA.

*Carter*, 510 U.S. at 13.

### A.    Procedural Compliance

The LHO found that the LEA did not comply with IDEA procedures because it

(1) did not assign qualified instructional assistants; (2) failed to evaluate J.K. with

regard to his suspected bipolar order; (3) used law enforcement in violation of the

BIP; (4) failed to modify the IEP and BIP to meet J.K.'s needs; (5) failed to place

J.K. in the least restrictive environment appropriate; and (6) failed to make a

decision regarding the appropriateness of placement at Kamp Kessa.

### 1. Instructional Assistants

8

In conjunction with an IEP, the LEA is required to provide special services to meet the child's educational and related needs. 34 C.F.R. § 300.350(a)(1); 707 K.A.R. 1:320 § 8(1). The LHO concluded that the LEA failed to fulfill this duty because the staff assigned to work with J.K. had not been properly trained to carry out his IEP and BIP. The ECAB reversed the LHO on this matter, and the court agrees that there is no evidence that the staff had not been trained or were not otherwise qualified to implement J.K.'s IEP and BIP. In fact, testimony at the hearing demonstrates that the staff were familiar with *Explosive Child* and had been instructed on the de-escalation procedures appropriate for dealing with J.K. Those who had not been specifically trained were supervised by teachers who had.

### 2. Evaluation of Suspected Disability

IDEA requires an LEA to assess students in all suspected areas of disability. 20 U.S.C. § 1414(a)(3)(C); 34 C.F.R. 300.352(g); 707 K.A.R. 1:300 § 3. The LHO found that the LEA failed to comply with this requirement because, although two school psychologists suspected that J.K. had bipolar disorder and knew that bipolar disorder would affect his behavior, no steps were taken to have him evaluated. The court finds that even if the LEA was remiss in failing to take affirmative steps to confirm or deny its suspicion that J.K. was bipolar, it would not be actionable because it did not cause substantive harm. One of the school psychologists, Bobbie Burcham, testified before the LHO that the bipolar diagnosis was not significant from a behavioral standpoint. An IEP is designed to deal with a student's unique needs rather than the definition of the child's disability. Because

9

the LEA had been continuously addressing the behavioral manifestations and needs created by J.K.'s bipolar disorder, the failure to obtain an official diagnosis does not provide a basis for finding that the LEA violated IDEA.

### 3.  Implementation of BIP

An LEA is required to make a good faith effort to accomplish the goals and objectives stated in the student's IEP.  34 C.F.R. § 300.350(a)(2); 707 K.A.R. 1:320 § 8(1).  At the same time, no one involved in applying the IEP is accountable for the child's failure to achieve those goals.  34 C.F.R. § 300.350(b).

The LHO found that the LEA consistently and purposefully disregarded J.K.'s BIP by attempting to awaken J.K. and also by allowing police to intervene in J.K.'s discipline.

The ECAB agreed that the IEP was not properly implemented, but found that J.K. was unilaterally removed from the LEA before the LEA's resources and options for implementation could be exhausted.  Essentially, the ECAB found that J.K.'s mother *prevented* the LEA from implementing the IEP by prematurely withdrawing him from the school.

The court agrees that the LHO erred in finding that the LEA violated IDEA by failing to implement the IEP and BIP.  However, the court's conclusion is based on its finding that the IEP and BIP were, in fact, implemented in a way that satisfied IDEA.  An LEA is bound to make a good faith effort to reach the student's goals, but it is also bound to provide a continuum of alternative placements and, within that continuum, designate the least restrictive environment appropriate.  20 U.S.C.

10

§ 1412(a)(5)(A); 34 C.F.R. § 300.550(b); 707 K.A.R. 1:350 § 1.

Testimony at the hearing before the LHO reveals that efforts to wake J.K. were done gently and with attention to the possibility that he would react explosively. Although J.K.'s "Basket Plan" BIP instructs that sleeping is to be "consistently" ignored, consistently does not mean always. Further, if the staff overlooked J.K.'s sleeping in every instance, any progress toward the IEP goals would be a virtual impossibility, which would in turn constitute a failure to implement the IEP.[3]

The court finds that the involvement of law enforcement officers in J.K.'s arrests did not constitute a failure to implement the IEP. Staff had been instructed that law enforcement was to be a last resort in the event that J.K.'s behavior created a safety concern. Even assuming the arrests were not the result of events implicating safety issues, there is no indication that any person responsible for having knowledge of and implementing the IEP called upon law enforcement assistance. Therefore, there is no basis to support the LHO's holding that police involvement constituted a failure to implement the IEP and consequently a violation of IDEA.

---

[3]The court notes that J.K.'s sleeping and consequent absence from classes were a constant concern for the ARC and his mother. Therefore, it was appropriate in the context of the *entire IEP*, not only the BIP, to take measures to correct the problem. Furthermore, the educators charged with implementing the IEP were frequently challenged about their permissiveness with regard to J.K.'s sleeping; the inconsistency with which the plaintiffs address the issue —criticizing both the failure to wake J.K. and the decision to awaken him on occasion —is indicative that the LEA's actions in this respect were not inappropriate.

The LEA's good-faith effort to achieve J.K.'s goals is evidenced by the frequency with which it held ARC meetings and the gradual manner in which it increased J.K.'s time in the resource room as opposed to regular classes.  The joint requirements imposed on an LEA to provide a continuum of alternative placements and to choose the least restrictive appropriate placement would be pointless if incremental movement along the continuum were not permitted and even encouraged.  Furthermore, the record demonstrates that, despite an apparent downward spiral, placement in the resource room was advancing J.K.'s educational objectives because his teachers observed that he was generally more productive there.  Where good-faith efforts have been made, the child's failure to achieve his goals does not equate to a failure by the LEA to implement the IEP.

### 4.  Modification of IEP and BIP

An IEP is required to set out measurable annual goals related to participation and progression in the general curriculum and meeting other educational needs associated with a student's disability.  20 U.S.C. § 1414(d)(1)(A)(ii); 34 C.F.R. § 300.347(a)(2); 707 K.A.R. 1:320 § 5(7)(b).  The ARC must periodically review the IEP to address the student's progress toward his annual goals and revise the IEP appropriately considering any lack of progress, reevaluation, new information, anticipated needs, and other relevant information.  20 U.S.C. § 1414(d)(4)(A); 34 C.F.R. § 300.346(b); 34 C.F.R. § 300.343(c); 707 K.A.R. § 2(4).

The LHO found that the LEA failed to comply with these procedural requirements on September 12, October 13, and October 16, because the goals

12

listed in the IEP were not appropriate given J.K.'s behavioral problems.  The LHO also found that the November meetings were procedurally deficient because the ARC did not modify the IEP to address J.K.'s attendance problem and his new bipolar diagnosis.

The ECAB reversed this portion of the LHO's holding because the goals and objectives were always agreed upon as appropriate considering J.K.'s mental and behavioral problems.

This court agrees with the ECAB that the LEA did not violate the procedural requirements of IDEA.  The ARC made frequent alterations to its approach to providing J.K. with a FAPE.  Consistent with J.K.'s mother's concerns and approval, the ARC undertook a course of progressively restrictive placements and increased supervision.  At the final meeting, the ARC resolved to make further allowances for sensory breaks by rearranging the resource room, to allow J.K. to spend more time in the resource room, and to provide additional adult supervision. In addition, the ARC was prepared to discuss homebound placement in the event J.K. was unable to obtain a FAPE within the school system.  The ARC also adjusted J.K.'s objectives according to his past difficulties.

Because the LEA did not violate the procedures prescribed by IDEA, it is unnecessary to consider whether the procedural shortcomings deprived J.K. of a FAPE or educational opportunity.  However, even if the course adopted by the LEA were procedurally deficient, the court finds that J.K. was not deprived of a FAPE. Irrespective of the extent to which certain of J.K.'s emotional and educational

difficulties were reflected *on the face* of his IEP, the record demonstrates that J.K. in practice had "access to specialized instruction and related services . . . individually designed to provide educational benefit" to him as required by IDEA. *Rowley*, 458 U.S. at 201.

### 5. Least Restrictive Environment

IDEA requires an LEA to provide a continuum of alternative placements to meet a qualifying student's needs. 34 C.F.R. § 300.551; 707 K.A.R. 1:350 § 1(2). The IEP must assure that an impaired child participates in classes and activities with non-disabled children to the maximum extent appropriate. 20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. § 300.550(b); 707 K.A.R. 1:350 § 1(1).

The LHO found that the LEA violated the least restrictive environment requirements on September 12, 2003, when it assigned J.K. to the resource room for part of each day. The LHO held that subsequent increases in J.K.'s resource room assignment exacerbated the LEA's violations. The LHO determined that the LEA by-passed available intermediate steps that would have allowed J.K. to remain in regular education classes and that it increased J.K.'s restriction despite its knowledge that he was less successful in restricted environments.

The LHO erred in concluding that the LEA violated IDEA by systematically increasing the portion of the day for which J.K. was assigned to the resource room. The minutes of the ARC meetings reflect that several members had observed that J.K. was more productive in a restricted setting than in a regular classroom. The ARC was careful to maximize his regular class attendance by keeping him in regular

classes in which he tended to perform well despite the less controlled setting.  The progression from all regular classes to full-time restriction was made over a three-month period in which five ARC meetings were held.  The gradual and deliberate manner in which the LEA increased J.K.'s restriction therefore comports with IDEA requirements.

### 6.  ARC Consideration of Kamp Kessa

An ARC includes, at a minimum, the child's parent(s); a regular education teacher; a special education teacher; an LEA representative with authority to provide special instruction, knowledge of the general curriculum, and knowledge about LEA resources; and an individual who can interpret evaluations.  34 C.F.R. § 300.344(a)(1)-(5); 707 K.A.R. 1:320 § 3(a)-(e).  The LEA must "ensure that there is no delay in implementing a child's IEP, including any case in which the payment source for providing or paying the special education and related services to the child is being determined."  707 K.A.R. 1:320 § 1(5).

The LHO found that the LEA violated IDEA when it declined to approve funding for Kamp Kessa and apparently declared that the ARC could not approve such funding even if it had considered such placement to be proper.  The parties disagree over whether the ARC knew it had the authority to approve funding.  The existence of such authority is immaterial because the record shows that the ARC did not consider Kamp Kessa to be an appropriate placement and that the ARC was confident that J.K.'s IEP could be implemented within the school.  The delay in implementing the IEP was caused by J.K.'s unilateral withdrawal from school and

failure to return for any meaningful time period.

### B.      Appropriateness of the IEP

The LHO found that J.K.'s IEP was not designed to provide a basic floor of opportunity as required under *Rowley*. The LHO cited the LEA's lack of attention to significant problems (sleeping and missing classes) and its failure to implement the IEP properly to support this conclusion.

The court finds that the plaintiff failed to establish that the IEP was not sufficient to provide a basic floor of educational opportunity. As discussed above, the ARC was well aware of and concerned with J.K.'s class attendance. It was also aware, however, of other educational obstacles such as physical and verbal explosiveness, high anxiety and stress, and lack of focus. The LEA's duty to provide individualized services required it to consider J.K.'s impairments collectively rather than in isolation. J.K.'s IEP and BIP were formulated and adjusted, with his mother's consent and approval, according to the staff's experiences with J.K.'s several impairments and the information they received from J.K.'s mother.

Given J.K.'s unique needs, the IEP developed by the LEA was reasonably calculated to confer educational benefit, and the LEA cannot be held responsible for J.K.'s failure to meet the goals stated in the IEP when it made a good faith effort to help him do so. Furthermore, the LEA's deliberately graduated movement along the continuum of placements had not been exhausted when these proceedings were instituted. The LEA was prepared to increase J.K.'s restriction, make physical modifications to his classroom to accommodate his sensory and anxiety problems,

16

and provide additional assistance to him at all times.  The LEA was never given an opportunity to implement these changes, and it cannot be faulted for not immediately imposing full-time resource room placement instead of trying to maximize J.K.'s time spent with non-disabled students.  *See Florence,* 9 F.3d at 458 (IEP must be given chance to succeed).

### C.   Appropriateness of Private Placement

To be entitled to reimbursement for unilateral withdrawal and private placement, a plaintiff must prove both that the LEA was incapable of providing a FAPE and that the private placement was proper in light of the student's IEP.   *See Carter*, 510 U.S. at 12-13.  Because the court finds that the plaintiff failed to show that J.K.'s IEP was inappropriate and that J.K. could not receive a FAPE in the public schools system, it is not necessary to determine whether Kamp Kessa was an appropriate placement.[4]

In light of the foregoing —the LEA did not violate IDEA procedures and the IEP was appropriate —the court finds that the plaintiff is not entitled to reimbursement for the cost of Kamp Kessa and/or compensatory education equivalent to the services missed during J.K.'s unilaterally imposed absence from the school.

### III.   Other Relief

---

[4]The court is skeptical, however, that Kamp Kessa could be deemed an appropriate private placement given the limited information available to all parties, the short duration of the camp, and the evident failure of the camp to create any lasting changes in J.K.'s personal and educational development.

The LHO, beyond awarding compensation for the 2003-2004 school year through the effective date of his decision, required the LEA to make several other concessions.

### A.      Kamp Kessa and Treating Psychiatrist Participation on ARC

Camp representatives and treating psychiatrists are not mandatory ARC members.  34 C.F.R. § 300.344(a) (listing required ARC participants); 707 K.A.R. 1:320 § 3 (same).  The parent and LEA have discretion to invite other persons with "knowledge or special expertise regarding the child."  34 C.F.R. § 300.344(a)(6); 707 K.A.R. 1:320 § 3(1)(f).  The failure to consult additional advisors chosen by J.K.'s mother is not grounds for relief because their exclusion did not deprive J.K. of a FAPE.  *See Renner v. Bd. of Educ. of Pub. Sch. of Ann Arbor*, 185 F.3d 635, 644 (6th Cir. 1999) (failure to consult with parents' expert did not cause serious deficiency in IEP); *Kings Local Sch. Dist., Bd. of Educ. v. Zelanzy*, 325 F.3d 724, 733 (6th Cir. 2003) (same).  J.K.'s mother has the right to bring a Kamp Kessa representative or an outside psychiatrist to future ARC meetings, but there is no authority supporting the LHO's mandate that their discretionary inclusion be procured and paid for by the LEA when there is no evidence that their absence *in the future* would result in a denial of a FAPE.

### B.      BIP Training for School Security or Police Officers

The court agrees with the ECAB that LEA has no obligation to train law enforcement officers.  IDEA contemplates that teachers, schools, and LEAs shall be responsible for providing specialized educational services.  *See* 34 C.F.R. §

300.350(b) (authorizing states to hold teachers, schools, and agencies accountable for failed IEPs).  Therefore, the training ordered by the LHO is beyond the relief appropriate under IDEA.

### C.      ARC Meeting and IEP Development

The court agrees that the ARC shall convene as soon as practicable and shall develop an appropriate IEP for J.K.  This review should be conducted in accordance with IDEA.  Therefore, any relief ordered by the LHO which is outside the scope of IDEA is denied, and any relief ordered by the LHO which is within the scope of IDEA is hereby granted to the extent determined necessary and appropriate.  Accordingly,

**IT IS ORDERED** that the plaintiff's motion for judgment on the pleadings (DE 13) is **DENIED**.

**IT IS FURTHER ORDERED** that the LHO's order is **AFFIRMED IN PART** and **REVERSED IN PART**.  Paragraphs 1, 2, 3, 5, 6, 8, 9, and 10 of the LHO's order are **REVERSED** for the reasons discussed herein.  Paragraphs 4 and 7 of the LHO's order are **AFFIRMED**.

Signed on January 30,

2006



JENNIFER B. COFFMAN, JUDGE
U.S. DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY